Nat Tully Semel v. Commissioner.
Semel v. Commissioner
Docket No. 916-62.
United States Tax Court
T.C. Memo 1965-232; 1965 Tax Ct. Memo LEXIS 97; 24 T.C.M. (CCH) 1176; T.C.M. (RIA) 65232; August 27, 1965
Jules Ritholz, for the petitioner. Alan L. Swartz, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent determined deficiencies in the petitioner's income tax *99 and additions to the tax as follows: Addition to Tax
Sec. 6653(a),
Year
Deficiency
I.R.C. 1954
1955
$ 8,117.70
$405.89
1956
9,622.20
1957
9,610.04
$27,349.94
$405.89
Several of the issues raised by the pleadings have been settled by agreement of the parties, leaving only the following for our consideration: (1) Whether the petitioner is entitled to deductions, either as business bad debts or as ordinary business losses arising from a claimed joint venture, in the amounts of $10,000 for the year 1955, $20,000 for the year 1956, and $20,000 for the year 1957, as the result of certain advances made to his wholly-owned corporation in 1950; (2) Whether the petitioner is entitled to a loss deduction of $12,270 for 1955 because his title to improved real estate was divested by a judgment of a United States District Court for the District of Connecticut; (3) Whether the petitioner is liable for the addition to tax for 1955 prescribed by section 6653(a). [1]
(4) Whether the petitioner is entitled to a deduction for alimony or support payments of $750 for 1955; (5) Whether *100 the petitioner is entitled to a deduction as a trade or business expense for office salaries of $660 for 1955; (6) Whether the petitioner is entitled to deductions for charitable contributions in the amounts of $1,070 for 1955, $1,156 for 1956 and $1,187 for 1957; (7) Whether the petitioner is entitled to deductions for legal fees of $1,000 for 1956 and $1,150 for 1957; (8) Whether the petitioner is entitled to a business expense deduction for automobile expenses of $1,210 for 1956; (9) Whether the petitioner is entitled to a child care deduction of $600 for each of the years 1956 and 1957; (10) Whether the petitioner is entitled to a deduction for office expenses of $1,000 for 1957; and (11) Whether the petitioner is entitled to a deduction as a business expense for membership dues in various civic and fraternal associations in the amount of $68 for 1957. Findings of Fact Some of the facts have been stipulated and are so found. The petitioner Nat Tully Semel of Amston, Connecticut, (hereinafter sometimes referred to as Semel) filed Federal income tax returns with the district director of internal revenue, Hartford, Connecticut, for the calendar years 1955, 1956 and *101 1957. Issue 1 United Distillers Products Corporation (hereinafter referred to as United Distillers) was incorporated under the laws of New Jersey in 1933, and its principal place of business is in Amston, Connecticut. The petitioner has been the president and treasurer of United Distillers and a member of its board of directors since its inception. From shortly before his wife's death in 1952 the petitioner has owned all of the company's common stock. The petitioner was responsible for issuing all the checks of United Distillers and signing all of its Federal income tax returns during the years in issue. During 1950 United Distillers was in need of funds for general corporate purposes, including the payment of various outstanding loans and for the prosecution of litigation to defend its whiskey licenses. Because of its financial condition the corporation was unable to obtain funds through conventional loans; consequently, it and the petitioner entered into an agreement denominated by the parties as a joint venture. On or about July 27, 1950, the petitioner delivered three checks totaling $105,000 to United Distillers. Two of these checks are directly involved in this case *102 and are in the amounts of $35,000 and $25,000 respectively. On the face of each such check is written the word "note." The third check was for $45,000. In return for this third check United Distillers gave the petitioner a promissory note for $45,000 and as security executed a negotiable warehouse receipt. The loan for $45,000 is not a part of the alleged joint venture, so it is not directly involved in this case. The petitioner's personal records reflect payments on this $45,000 note in the amounts of $25,000 in 1951, $3,500 in 1952, $2,500 in 1953, and $1,149.31 in 1960. On or about August 16, 1950, N. T. Semel, Inc. (hereinafter referred to as Semel, Inc.), a corporation wholly owned by the petitioner, gave United Distillers a check for $55,000. All four of the above checks were entered on United Distillers' "General Ledger Account No. 51, Notes Payable" as follows: July 27, 1950
$35,000
July 27, 1950
$25,000
July 27, 1950
$45,000
Aug. 16, 1950
$55,000
In a petition filed with this Court in an unrelated case, Docket No. 91198, signed and verified by the petitioner, he characterized this $160,000 advanced to United Distillers in 1950 as "Note payable renewed" *103 and later in the petition as a "renewal transaction." Undetermined parts of the $160,000 so advanced by the petitioner and Semel, Inc., were used by United Distillers to satisfy parts of its outstanding indebtednesses totaling approximately $230,000 [2] to the petitioner, Semel, Inc., Florence Operating Corporation, a corporation also wholly owned by the petitioner, and individuals whom the petitioner could not or would not name. On July 27, 1950, the petitioner, as president of United Distillers, executed a demand note in the amount of $35,000, payable to "the order of OURSELVES," with stated interest of 6 percent. On the back of this note under the printed word "collateral" appeared the words "Negotiable Warehouse Receipt, issued by United Distillers Products Corp., No. 788 *104 for 1411 Cases Whiskey." The note was endorsed in blank by petitioner, both as president of United Distillers, and personally. One week earlier, on July 20, 1950, the petitioner, as president of United Distillers, had executed the said Negotiable Warehouse Receipt No. 788, subject to the order of United Distillers. Also on July 27, 1950, the petitioner, as president of United Distillers, executed a document which provided in its entirety as follows: Joint Venture Agreement between United Distillers Products Corp. and Owner of Colateral Note for $35,000, wherby [whereby] said owner is to share in the profits as ordinary income on the sale of attached colateral to the extent of 50%. On the same respective dates, three similar documents were executed by the same parties, to wit: a 6 percent promissory note for $25,000, another negotiable warehouse receipt "No. 789 for 883 Cases Whiskey," and another "Joint Venture Agreement," this one referring to a "Colateral Note for $25,000." At some indeterminate time before the end of 1954 the Florence Operating Corporation (hereinafter sometimes referred to as Florence Operating) acquired a $10,000 interest in the above $35,000 note. United *105 Distillers made a payment thereon of $9,500 to Florence Operating in 1954. In 1955 United Distillers paid the petitioner $660 on the $35,000 note. These payments of $9,500 and $660 were the only ones ever made by United Distillers on the two notes involved in the so-called "joint venture." All of the whiskey involved in the joint venture was tax paid, meaning that the applicable Federal and state taxes had been paid. The record in this case is highly unsatisfactory, but we can and do find that about 40 percent of the whiskey was sold by the end of 1954. The balance was sold by June 30, 1957. Most of the sales from 1952 through 1954 were made at a profit, but much of the whiskey sold from 1955 to 1957 was sold at cost. None of the whiskey was sold for less than taxes. The petitioner was never issued a wholesale liquor dealer's permit or any other permit needed to deal in whiskey under the Federal Alcohol Administration Act (hereinafter referred to as the FAAA). The petitioner and United Distillers were never issued a wholesale liquor dealer's permit or any other permit under the FAAA for the purpose of carrying on a joint venture or transacting business in any joint capacity. *106 The petitioner never received ordinary income from any activities related to dealing in whiskey. In 1945 and 1950 the petitioner had capital gains from the sale of several warehouse receipts for whiskey. The petitioner had never engaged in any joint venture for the disposition of whiskey prior to the alleged joint venture here in question. However, the petitioner had previously loaned money to United Distillers with warehouse receipts as security therefor. The petitioner was not engaged in any phase of the whiskey business, his only activity in such business was on behalf of United Distillers, his wholly-owned corporation. Issue 2 Since 1950 the petitioner has been the sole stockholder of Semel, Inc., a company engaged in the real estate business. Typically the petitioner would build apartment buildings with equipment owned by him and then sell the completed buildings at cost to Semel, Inc. The petitioner often rented, maintained and even repaired these buildings, but never charged Semel, Inc., for his services. The title to the buildings was always put in the name of Semel, Inc., on the advice of counsel, so that the petitioner would avoid personal liability on rent control *107 suits and on the mortgages covering the buildings. For the years 1950 through 1957 the petitioner's Federal income tax returns showed no rental income from real estate and no capital gains from the sale of real estate. For the year 1950 his return listed as income $1,786.74 for "Fees - Realty Management." During the years in issue the petitioner did not own a single piece of income-producing real estate. In 1952 United Distillers was in dire need of cash to pay charges on some overage whiskey so that it could be taken out of bond to avoid the imposition of further Federal taxes. Petitioner decided to have the Corporation sell a piece of its improved real estate in Amston, Connecticut (hereinafter called the Amston property) to raise the needed cash, and it was listed with several brokers, but only one offer of "a couple thousand cash, $185 payments" was received. The total amount of this offer is not in the record, but in 1955 the Reconstruction Finance Corporation (hereinafter referred to as RFC) appraised this property at $3,500. On or about September 5, 1952, the petitioner purported to buy the Amston property from United Distillers for $10,000 in cash, which amount petitioner *108 described as follows: "* * * there was no better offer than that. We got an offer nowhere near as good, * * *." The books and records of United Distillers and the 1952 Federal income tax return of United Distillers reflect receipt of such payment as $7,500 for the building, $200 for the land and $2,300 for equipment. On July 28, 1952, almost 6 weeks before the above conveyance, the RFC recovered a judgment against United Distillers in the United States District Court for the District of Connecticut. Petitioner was aware of this judgment when he dealt with United Distillers regarding the Amston property. United Distillers appealed such judgment to the United States Court of Appeals for the Second Circuit and on June 18, 1953, such court affirmed the decision of the District Court. On June 9, 1955, the United States District Court for the District of Connecticut entered a memorandum decision in Civil Action No. 4626 (Reconstruction Finance Corporation v. United Distillers Products Corp. and N. Tully Semel) determining that the aforesaid conveyance by United Distillers to the petitioner was for the purpose of hindering, delaying and defrauding United Distillers' creditors and accordingly *109 set such conveyance aside as in fraud of the RFC as a judgment creditor, for reasons fully set forth therein. On June 23, 1955, in this same action, the Court entered a judgment declaring the aforesaid conveyance from United Distillers to the petitioner null and void. The petitioner and United Distillers appealed to the United States Court of Appeals for the Second Circuit, and, on February 7, 1956, such court affirmed the decision and order of the District Court, at 229 F. 2d 665, for reasons fully set forth therein. On February 23, 1956, such court issued its mandate affirming the District Court's decision and order. Sometime after February 23, 1956, United Distillers and the RFC entered into an agreement settling United Distillers' liability to the RFC, and on May 22, 1957, the RFC quit-claimed the Amston property to United Distillers. Petitioner then took title to the property after satisfying outstanding real estate taxes. The petitioner has lived on the Amston property from before the conveyance from United Distillers in 1952, throughout all the years in issue, and to the time of the trial of this case. His wife and children also resided there until they left *110 petitioner in 1955. While living there, the petitioner improved the property by installing a central heating system and boiler at a total cost in excess of $400. The petitioner did not receive any rental income from this property during any of the years 1952 through 1956, and he did not deduct any depreciation or maintenance expenses with regard to this building. Issue 3 The petitioner prepared and filed on April 1, 1956, with the district director of internal revenue at Hartford, Connecticut, a joint United States Federal income tax return for the year 1955 reflecting both his income and the income of his wife Janet Zeleznicky Semel, (hereinafter referred to as Janet Semel or Janet), to whom he was legally married at the end of 1955. The petitioner did this even though Janet had told him during 1955 that she intended to file her own separate return. The petitioner testified that he sent the joint return through his attorney to Janet for her signature, and that it was returned to him signed. The return prepared by the petitioner included income of Janet Semel and failed to claim deductions for alimony and other expenses paid to her because of the election to use the joint return. *111 In fact Janet Semel filed an individual return showing a tax due and owing. The respondent determined that the alleged joint return was in fact the separate return of the petitioner. The respondent asserted an addition to the petitioner's income tax pursuant to section 6653(a) on the grounds that the petitioner signed Janet Semel's name to the return he filed for 1955. Issue 4 During the year 1955 the petitioner made alimony payments totaling $550 to Janet Semel pursuant to a court order dated September 27, 1955. Prior to this court order the petitioner made voluntary payments to Janet of $20 per week for 10 weeks at the oral suggestion of Judge Clifford Wright. She included the $750 she received from the petitioner in her individual income tax return for 1955. The respondent denied treatment as alimony to the $200 paid at the suggestion of Judge Wright on the grounds that these payments were not made after a decree of divorce or separation within the meaning of section 71(a) of the Code. Issue 5 In 1955 Janet Semel received $660 from United Distillers in payment for office services rendered to the petitioner and to United Distillers. Her duties included bookkeeping, preparing *112 Alcohol and Tobacco Tax forms (hereinafter referred to as ATT forms), answering the telephone and handling correspondence for the petitioner. Although the actual payments for her salary came from United Distillers, the amounts were charged to the personal account of the petitioner. Janet included the $660 in her individual income tax return for 1955. Issue 6 For the 3 years in issue the petitioner claims charitable contributions in the amounts of $1,070 for 1955, $1,156 for 1956, and $1,187 for 1957, but he furnished little documentary proof. Cancelled checks to Congregation Beth El of $25 in 1955, of $40 in 1956, and of $40 for 1957 were put in evidence. The petitioner also introduced into evidence a list of over 130 charities which he said he supported during the applicable years. Official receipts from only two of these charities (acknowledging payments of $55 during the years in issue) were introduced. The respondent allowed the petitioner a deduction of $300 for charitable contributions for each of the years 1956 and 1957. The respondent did not compute an allowable amount for 1955 because the maximum standard deduction of $1,000 exceeded the total amount of petitioner's *113 allowable itemized deductions. Issue 7 During 1956 and 1957 the petitioner paid $750 and $900, respectively, to attorney Samuel Rosenthal (hereinafter referred to as Rosenthal) for legal services. The $750 paid to Rosenthal in 1956 and $750 of the $900 paid to him in 1957 were for defending the petitioner in an assault and battery action brought against him by Janet. Of the remaining $150, $100 was paid to Rosenthal in 1957 for representing the petitioner in a divorce proceeding brought by Janet and $50 was paid to him for defending petitioner in a criminal assault and battery action also instituted by Janet. In both 1956 and 1957 the petitioner paid $250 to attorney Griswald Morgan (hereinafter referred to as Morgan), for legal services rendered to Janet Semel in connection with matrimonial proceedings instituted by her against petitioner. On his Federal income tax returns for 1956 and 1957 the petitioner claimed deductions for attorney's fees of $1,000 in 1956 and $1,150 in 1957. The respondent's determination denied the petitioner any deduction. Issue 8 During 1956 the petitioner owned 2 Cadillac automobiles. One of these cars he operated solely for personal uses, and *114 the other was used exclusively for business purposes. He drove the business car 12,100 miles in 1956 mainly in connection with the business of United Distillers and the alleged "Joint Venture." The petitioner claimed a deduction of $1,210 for automobile expenses based on an allowance of 10 cents per mile for gasoline, oil, depreciation, tolls, parking, and maintenance. The respondent disallowed this deduction on the grounds that the automobile expense was not incurred in connection with any trade or business of the petitioner. Issue 9 On his Federal income tax returns for 1956 and 1957 the petitioner claimed a deduction of $600 for child care expenses. During the years 1956 and 1957 the petitioner paid Janet Semel $40 per week for the support of his two minor children. The respondent denied the deduction because the petitioner did not prove that the payments were necessary to enable him to be gainfully employed. Issue 10 On April 11, 1957, the petitioner drew a check on his personal checking account to the order of United Distillers for $1,000. The petitioner claimed a deduction for this amount on his 1957 return as an expense for office rent. The respondent disallowed this *115 deduction on the grounds that the money was not spent for the purpose designated. The $1,000 was paid for the use of office machines and a secretary. The expenses of the office involved were shared by the petitioner, United Distillers, and Semel, Inc., in a proportion that cannot be determined from the record. The petitioner used this office mainly in connection with the real estate business of Semel, Inc., although he also used it to manage his investment portfolio. Issue 11 During 1957 the petitioner paid $68 in membership dues to various lodges and fraternal associations. These organizations included the Masonic Lodge, the Knights of Pythias, and the Fish and Game Club in Colechester. The petitioner claimed a deduction for $68 on his 1957 return, and the respondent denied this deduction, alleging that it was not a trade or business expense of the petitioner. Opinion, Issue 1 On his Federal income tax returns for the taxable years, 1955, 1956 and 1957 the petitioner claimed ordinary business losses of $10,000, $20,000 and $20,000, respectively. The petitioner argues that these losses resulted from a joint venture agreement he entered into with United Distillers, the disputed *116 losses resulting from the failure of United Distillers to sell at a profit whiskey covered by specified warehouse receipts. The petitioner's alternative theory is that the transaction in question created a loan from him to United Distillers which was incurred in his trade or business. The respondent denies that a joint venture between the petitioner and United Distillers ever existed. The respondent argues that the petitioner's advances to United Distillers amounted to a secured loan which was not incurred in any trade or business of the petitioner. The respondent further contends that the petitioner has not proved that these loans became worthless during any year before the Court. After reviewing the terms of the relevant documents, the conduct of the parties, and the applicable law, we have determined that the petitioner's advances to United Distillers created a secured debt. The alleged joint venture [3] was evidenced by 6 written documents, to wit: 2 warehouse receipts covering the whiskey in question, 2 negotiable promissory notes from United Distillers to the petitioner in the amounts of $35,000 and $25,000, and 2 documents each providing in its entirety as follows: *117 Joint Venture Agreement between United Distillers Products Corp. and Owner of Colateral Note for $35,000, wherby [whereby] said owner is to share in the profits as ordinary income on the sale of attached colateral [Colateral] to the extent of 50%. [4]
Before 1952 the petitioner's first wife, the late Ruth Semel, owned a majority of the stock in United Distillers. Her stock was transferred to the petitioner's name in 1952, and he notified the Alcohol Tax Unit (hereinafter referred to as the ATU) of the change. The ATU replied that the change of stock ownership resulted in a change of ownership and control of the business, and accordingly he was required to turn in United Distillers' 7 whiskey licenses and apply for 7 new ones. The petitioner did so but new licenses were never issued, [5] and on June 1, 1957, Semel received registered notice from the ATU stating that he had 30 days to get rid of the rest of the whiskey or it would be seized. All of the whiskey was sold by June 30, 1957. *118 The petitioner testified that during the period from 1952 to 1955 the market price for the whiskey involved fell by about 50 to 60 percent. In addition from sometime in 1955 through June 30, 1957, the sales were partially distressed because they were made under a threat of seizure from the ATU. The deplorable state of the record in this case makes it impossible to determine the exact cost of the whiskey. The state and Federal alcohol taxes were prepaid and amounted to $65,683.80. The petitioner testified that the cost of the whiskey and the bottles was about "several dollars" a case. Since the alleged joint venture involved 2,294 cases of whiskey, the total cost of the whiskey was more than $70,000. [6]
The record indicates that the first sales of the whiskey were made during 1952, and a few of these sales brought profits of $28 a case. The record defies any attempt at precision, but it appears that about 40 percent of the whiskey was sold by the end of 1954. From 1955 through June 30, 1957, the sales were partially *119 distressed because United Distillers did not have its whiskey licenses. Nevertheless, none of the sales was made for less than taxes. There are no sales receipts for at least 60 percent of the whiskey involved in the alleged joint venture. Although it is impossible to know the total income from the sale of this whiskey, it seems certain that United Distillers recovered at least its cost of $70,000. Adding the $70,000 of income from sales of the whiskey to the $60,000 advanced by the petitioner brings United Distillers' total receipts on the alleged joint venture to $130,000. From this $130,000 United Distillers made payments of only $9,500 to Florence Operating and $660 to the petitioner. Thus United Distillers' profit on this alleged joint venture was nearly $50,000, an amount about equal to the loss suffered by the petitioner. The legal relation known as a joint venture has been defined as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation," and also as "an association of persons *120 to carry out a single business enterprise for profit." Beck Chemical Equipment Corporation, 27 T.C. 840 (1957); Estate of L. O. Koen, 14 T.C. 1406 (1950); Chase S. Osborn, 22 B.T.A. 935, 945 (1931) and cases cited therein. Whether the parties have formed a joint venture is a question of fact to be determined by reference to substantially the same principles that govern the question of whether persons have formed a partnership which is to be accorded recognition for tax purposes. Hubert M. Luna, 42 T.C. 1067, 1077-1079 (1964); Smith's Estate v. Commissioner, 313 F. 2d 724 (C.A. 8, 1963), affirming on this issue 33 T.C. 465 (1959); Beck Chemical Equipment Corporation, supra. The conduct of the petitioner in the instant case indicates that he considered himself a creditor of United Distillers rather than a partner in a joint venture. In fact on his Federal income tax returns for 1955 and 1956 the petitioner characterized the deductions in question as bad debts. Other evidence indicates that the parties considered the transaction to be a loan rather than a joint venture. The two notes *121 in question referred to the warehouse receipts as collateral rather than as the assets of a joint venture; and the petitioner also referred to the warehouse receipts, or the whiskey covered by them, as collateral during his testimony. The two written instruments which purport to create the joint venture refer to the "attached colateral [Colateral]" rather than the property or assets of the venture. During his testimony the petitioner described the amount due to him as an indebtedness, and he referred to potential losses as bad debts. Adjudicated cases have listed the following as important factors to be considered in determing the existence or nonexistence of a joint venture: whether there was an obligation to share losses; whether the parties filed Federal partnership returns; whether separate books of account were maintained; and whether business was conducted in the joint name of the parties. Hubert M. Luna, supra; Smith's Estate v. Commissioner, supra; Beck Chemical Equipment Corporation, supra. The alleged joint venture in the instant case *122 fails all of these tests. There was no provision for the sharing of losses. In fact United Distillers had a profit of about $50,000 on this venture while the petitioner lost nearly an equal amount. No Federal partnership return was ever filed, (see Lucia Chase Ewing, 20 T.C. 216 (1953), L. C. Olinger, 10 T.C. 423 (1948)) even though from 1952 through 1954 the sales of whiskey were generally made at a profit. From 1955 through June 30, 1957, when some sales were made at a slight loss because they were only for taxes, the alleged joint venture never filed a return reflecting this loss. Separate books of account were not maintained for this alleged joint venture. The books of United Distillers recorded the advance of $60,000 as creating "Notes Payable." The petitioner's advance of $60,000 was treated by United Distillers on its books in the same manner as the $55,000 loan from Semel, Inc., made in August of 1950. The books and records of United Distillers are barren of any reference to the alleged joint venture. In fact in a petition filed with this Court in a case involving the taxable year 1950, the petitioner characterized the $160,000 advanced to United *123 Distillers during July and August of 1950 as "Notes payable renewed" and later in the petition as a "renewal transaction." Equally as important, the income from the sales of the whiskey was not put into any separate account but was commingled with the general funds of United Distillers. We think that the realities of the transaction and even the language employed by the parties compel the conclusion that the petitioner's advances to United Distillers created a secured loan, rather than a joint venture. The petitioner's alternative argument is that this loan was incurred in his whiskey business. The petitioner contends that he is in the whiskey business because of his activities on behalf of United Distillers, because of isolated sales in prior years of warehouse receipts for whiskey, and because of his involvement in the alleged joint venture. The respondent denies that the petitioner is individually in the whiskey business and argues that the loan was not made in connection with any trade or business of the petitioner. The respondent further contends that the petitioner has not proved that the loan became worthless during any of the years before the Court. The record falls far *124 short of supporting the petitioner's contention that he was in the whiskey business from 1955 through 1957. None of the reasons advanced by him has merit. It is firmly established that the business of a corporation is not that of its shareholders or officers. Deputy v. du Pont, 308 U.S. 488 (1940); Charles G. Berwind, 20 T.C. 808 (1953), affirmed per curiam 211 F. 2d 575, (C.A. 3, 1954); Whipple v. Commissioner, 373 U.S. 193 (1963). The circumstances of the instant case do not justify an exception to the general rule. The petitioner was not in the business of being an independent investor in whiskey warehouse receipts. In 1945 and 1950 he made a profit on the sale of warehouse receipts, but this profit was treated as a capital gain. The petitioner showed no ordinary income or capital gain from the sale of whiskey or even whiskey warehouse receipts during the years in question. All of his activities in the whiskey business were on behalf of United Distillers during the years before the Court. The petitioner's third argument is that he was in the whiskey business because of his participation in the alleged joint venture. We *125 have already decided that the so-called joint venture was in fact a secured loan. It follows that the petitioner's argument has no merit. The final question for decision under this issue is whether the loan, which was not incurred in connection with any trade or business of the petitioner, became wholly worthless during any of the years before the Court. Unlike a business loan, a nonbusiness loan cannot be partially charged off as it becomes worthless, but is deductible only for the year in which it becomes totally worthless. Section 166(d)(2), (A) and (B). We hold that the loan became worthless during 1957. By June 30, 1957, the last of the whiskey securing the loan was sold. This means that the petitioner was then an unsecured creditor of United Distillers. The Federal income tax return of United Distillers for 1957 shows that the company ended the year with an earned deficit of $373,710.90. The company's assets were worth $82,144.88; the accounts payable totaled $31,390.98; the bonds, notes and mortgages maturing in less than a year amounted to $120,340; and "long-term" debts amounted to $294,000. We think it would have been a "hollow ritual" for the petitioner to have sued *126 United Distillers for his claim of nearly $50,000. This Court has allowed a deduction for the worthlessness of a debt on facts much less favorable to the taxpayer than in the instant case. Dallas Rupe & Son, 20 T.C. 363 (1953). Opinion, Issue 2 On his income tax return for 1955 the petitioner claimed a deduction of $12,270 as a loss suffered on the Amston property. Petitioner contends that this loss was either incurred in his real estate business or resulted from a transaction entered into for profit. He argues that his activities on behalf of either Semel, Inc., or the Amston property alone were sufficient to put him in the real estate business. The respondent denies that the petitioner is in the real estate business claiming that the business of Semel, Inc., is not that of the petitioner and further that the use of the Amston property for personal, residential purposes defeats petitioner's argument that he held the property for business reasons. At the threshold of this issue lies the question whether petitioner has suffered any loss. It seems clear to us that he has not, for under the holdings of the District Court and the United States Court of Appeals for *127 the Second Circuit in Civil Action No. 4626 and at 229 F. 2d 665, because of his own fraudulent actions, the petitioner never acquired any title, good as against the defrauded creditors of United Distillers (the RFC). Petitioner acquired title, good as against United Distillers, but this was never lost. See Doty v. Wheeler, 120 Conn. 672, 182 Atl. 468. Additionally, the evidence casts doubt on the petitioner's testimony that his primary motive in buying the property was to make a profit. It seems apparent to us that the Amston property could have been purchased for much less, yet Semel chose to pay $10,000 in cash and gave no reason for paying this premium except that he "thought the land was worth it." The petitioner also testified that a motive in buying the property was to help out United Distillers, because the company needed the cash badly. This is probably the true reason for the inflated price paid by petitioner, and if we had to put an exact label on this transaction (which we do not) we would term it a contribution by Semel to the capital of his wholly-owned corporation. The petitioner tried to establish the existence of a profit motive by pointing *128 to the repairs he made on the building, allegedly to make it more attractive to prospective tenants, saying that he hoped to rent the building as a warehouse. The repairs involved the installation of a boiler and other materials necessary for a central heating system. This building was used as the residence of the petitioner and his wife and children from before the time he purchased it until his family left him in 1955, and thereafter by petitioner alone. Although he testified that he installed the central heating for business reasons, he also testified that, "We just couldn't bear the thought of staying there all winter with a baby living on the premises without central heating." The petitioner failed to show how central heating would make the building more attractive as a warehouse. He did not make the repairs at the suggestion of his rental agents. The petitioner has not carried his burden of showing that the primary purpose for his purchase of the Amston property was to make a profit. He paid more than was necessary for the property, and the personal comfort of his family was an important, if not the controlling, reason for the repairs he made. A deduction under section 165(c)(2) *129 cannot be allowed unless the primary and dominant purpose of the transaction was the hope of future profit. John Randolph Hopkins, 15 T.C. 160 (1950); Early v. Atkinson, 175 F. 2d 118 (C.A. 4, 1949); Valentine Howell, 41 T.C. 13 (1963). The petitioner's alternative argument for the deduction is that his loss on the Amston property was incurred in his individual real estate business. The petitioner argues that his extensive activities on behalf of Semel, Inc., are sufficient to put him in the real estate business so that his loss on the Amston property is deductible in full pursuant to section 1231(a). This section provides in pertinent part that losses on the sales of property used in the taxpayer's business shall be treated as ordinary losses. It is well settled that absent exceptional circumstances a corporation and its stockholders are to be treated as separate and distinct entities for tax purposes. The trade and business of a corporation is not that of its sole stockholder. Deputy v. du Pont, supra; Burnet v. Clark, 287 U.S. 410 (1932); *130 Charles G. Berwind, supra, affirmed per curiam 211 F. 2d 575 (C.A. 3, 1954). The facts of the instant case do not justify an exception to the general rule. Although the petitioner individually often built rental apartment buildings, he always sold the buildings to Semel, Inc., at cost. The petitioner never made a profit on any of these buildings. The title to the buildings was always put in the name of Semel, Inc. The rental income and the depreciation on these properties was reported on the return of Semel, Inc. The petitioner's individual income tax return for 1955 does not reflect any income from real estate operations. As was true of United Distillers, Semel, Inc., did not pay the petitioner a salary during any of the years before the Court. With the single exception of the Amston property all of the petitioner's activity in the real estate business was done in the name of Semel, Inc. The petitioner also argues that the loss in question was incurred in his business of selling improved real property. Under this theory his loss on the Amston property would be deductible in full from his income by virtue of section 165(c)(1). *131 Determining whether a taxpayer is engaged in a trade or business is a question of fact. Higgins v. Commissioner, 312 U.S. 212 (1941); Harriss v. Commissioner, 143 F. 2d 279, 281 (C.A. 2, 1944). In a case such as this the burden of proving that fact is upon the taxpayer. New Colonial Co. v. Helvering, 292 U.S. 435 (1934); Beck v. Commissioner, 179 F. 2d 688 (C.A. 7, 1950), affirming a Memorandum Opinion of this Court. In the instant case the petitioner has not come even close to sustaining this burden. The petitioner's final argument under this issue is that the loss was incurred in his business of renting improved real property. The petitioner argues that his efforts to rent the Amston property, although unsuccessful, were nevertheless sufficient to put him in the business. To establish his right to the deduction the petitioner relies on such cases as N. Stuart Campbell, 5 T.C. 272 (1945); Fackler v. Commissioner, 133 F. 2d 509 (C.A. 6, 1943), affirming 45 B.T.A. 708 (1941); George S. Jephson, 37 B.T.A. 1117 (1938). All *132 of the cases are distinguishable. For all of the foregoing reasons, we sustain the respondent's determination on this issue. Opinion, Issue 3 The respondent asserted an addition to the petitioner's tax for 1955 for negligence pursuant to section 6653(a) of the Code. The respondent's determination of this addition to tax is presumed to be correct. Marion C' de Baca, 38 T.C. 609 (1962), reversed on another issue, 326 F. 2d 189 (C.A. 5, 1964). The disputed addition to tax revolves around the filing of a joint return for 1955 with a signature purporting to be that of Janet Semel. The respondent contends that the petitioner signed her name to the return, and that this amounts to an "intentional disregard of rules and regulations," or at best negligence, since Janet Semel told the petitioner she intended to file a separate return for 1955. The petitioner claims that the return in question was actually signed by Janet Semel. There was considerable conflict in the testimony of the petitioner and Janet Semel about the circumstances surrounding the filing of this joint return. Semel testified that sometime in 1955 he told his wife he was preparing a joint *133 return for her to sign, and she replied "okay." He testified further that after consulting with a lawyer, he prepared a joint return and mailed it to his lawyer for forwarding to Janet. According to Semel, he received the joint return bearing her signature in the prepaid envelope he had originally enclosed. At the time Janet Semel had already filed a separate return with the district director of internal revenue at Hartford, Connecticut. Janet Semel testified that the signature in question was not hers. She further testified that rather than agreeing with the petitioner to file a joint return for 1955, she told him that she intended to file a separate return. Thus faced with a direct conflict between the testimony of the petitioner and Janet, we prefer to believe Janet. The petitioner's testimony on this and other issues was lacking in candor, reliability, and consistency. Petitioner at one point testified that all of the whiskey involved in the alleged joint venture was sold during 1955, 1956 and 1957. Later on cross-examination he admitted that at least 40 percent of this whiskey had been sold prior to 1955. The petitioner identified his signature on one exhibit, and after being *134 shown the similarity between this signature and the one purporting to be Janet Semel's, he denied that the signature was his. The petitioner testified that United Distillers was insolvent in 1950 and later testified that the company was solvent for that year. The petitioner originally testified that he owned the apartment buildings he built but later admitted that these buildings were owned by Semel, Inc. Another incident reflects on the credibility of the petitioner. After examining a subpoena duces tecum tendered him by a revenue agent directing production of certain records of United Distillers before this Court, petitioner denied that he was Nat Tully Semel. Yet at the trial of this case petitioner denied ever misrepresenting any facts to a representative of the Internal Revenue Service. Several exhibits introduced into evidence contain the petitioner's signature. His signature bears a striking resemblance to the disputed signature. Janet's signature was always carefully drawn; the petitioner's was a scrawl. The disputed signature is scrawled. The petitioner testified that his wife was an erratic handwriter, but he did not produce a single specimen of Janet's handwriting even *135 remotely resembling the disputed signature. The petitioner has not sustained his burden of disproving the presumptive correctness of the respondent's determination of an addition to tax in accordance with section 6653(a). We sustain the respondent on this issue. Because the return filed by the petitioner for 1955 was separate, it is necessary to consider his right to claimed deductions for alimony payments and office salary expense for that year. These deductions were not asserted on petitioner's return originally filed for 1955 because it purported to be a joint return. Opinion, Issue 4 The fourth issue for decision is whether the petitioner is entitled to a deduction for alimony payments under section 215 of the Code in the total amount of $750 for 1955. The respondent has conceded that the petitioner would be entitled to a deduction for alimony payments of $550 for 1955, made pursuant to the court order of September 27, 1955, except that in lieu thereof the petitioner has been allowed a standard deduction of $1,000 for that year. The respondent's argument is that the standard deduction of $1,000 exceeds the total of the allowable itemized deductions. [7]
*136 In the spring of 1955 after the petitioner and his wife had separated and she had started a suit against him for assault and battery, her lawyer called the petitioner and threatened him with arrest unless he sent her support payments. The petitioner then telephoned the "local judge" for advice. He identified this judge as Judge Clifford Wright, who had heard the criminal assault and battery action. The judge who later heard the divorce proceeding in the Superior Court was the Honorable James E. Murphy. Judge Wright advised the petitioner over the telephone to send Janet $20 a week for 10 weeks. The petitioner made weekly payments of $20 from May 26 to August 6, 1955. The respondent concedes that such payments were made, but denies that they are entitled to treatment as alimony within the meaning of the Code. Section 215 of the Code allows the taxpayer to deduct from his income any payments made during the year which qualify as alimony within the meaning of section 71. Section 71(a)(1) provides that payments received after a decree of divorce or separate maintenance are to be treated as alimony *137 and includible in the gross income of the recipient. The order of September 27, 1955, requiring the petitioner to pay alimony is entirely prospective and makes no mention of these prior weekly payments. Until a status of divorce or legal separation exists, the husband has a duty to maintain and support his family without any deduction for doing so. The petitioner's further argument to the effect that an informal oral "order" made by a judge who did not hear the divorce suit amounts to a decree of divorce or legal separation within the meaning of section 71(a)(1) cannot be accepted. Not surprisingly, the petitioner has not cited us to any cases sustaining his interpretation of the section. This issue is deciced for the respondent. Opinion, Issue 5 This issue involves a determination that petitioner is not entitled to a deduction for office salaries in the amount of $660 for the taxable year 1955. It is undisputed that the petitioner paid Janet the amount in question as wages for the performance of office work and secretarial services. The respondent denied the deduction on the grounds that the expense was not incurred in any trade or business of the petitioner. There was *138 conflict in the testimony as to the services actually performed by Janet. She testified that she did a little bookkeeping, answered the telephone, made out invoices and filled out "quite a few" ATT forms. She also testified that she did the bookkeeping and made out the ATT forms for United Distillers. The petitioner testified that she took care of his personal books, did some typing made out government records, answered the telephone and made herself generally useful in the office. He thought that 99 percent of her services were rendered to him personally. For the reasons heretofore stated, when faced with a direct conflict between the testimony of the petitioner and Janet, we prefer to believe the testimony of the latter. Consequently, we hold that at least a significant part of Janet's services were rendered to United Distillers. On brief the petitioner merely states that he is entitled to a deduction of $660 for "wage expense." We can only assume that his claim to the deduction is based on either section 162 or 212. Section 162 allows a deduction only if the expense is paid or incurred in carrying on a trade or business of the taxpayer. The petitioner has failed to establish *139 that he was in the business of dealing in whiskey or whiskey warehouse receipts, nor did the petitioner prove that he was in the real estate business. He has not proved his right to the deduction under section 162. Deputy v. du Pont, supra; Burnet v. Clark, supra; Charles G. Berwind, supra.
Section 212 of the Code allows a deduction for all the ordinary and necessary expenses paid for "the production or collection of income," or for "the management, conservation, or maintenance of property held for the production of income." The weight of the credible evidence indicates that a considerable part of Janet Semel's office work during 1955 was done for the benefit of United Distillers. The petitioner received no salary or any other income from United Distillers during 1955. It follows that the expenses of the work Janet Semel did for United Distillers are not deductible by the petitioner under section 212. It is possible that part of her services were rendered individually to the petitioner to help him manage his portfolio of stocks and bonds, but *140 the petitioner has not introduced proof of this. He must suffer the consequences of the state of the record on this point. The burden is on the taxpayer to prove that the facts bring his case clearly within the deduction provisions of the statutes. Commissioner v. Heininger, 320 U.S. 467 (1943). Opinion, Issue 6 In this issue we must decide whether the petitioner is entitled to deductions for charitable contributions for the years 1955, 1956 and 1957 in excess of the amounts allowed by the respondent. On his returns for the years in question the petitioner claimed charitable contributions of $1,070, $1,156, and $1,187, respectively. The respondent allowed the petitioner $300 for each of the years 1956 and 1957, but respondent did not compute an allowable amount of charitable contributions for 1955, computing the petitioner's income tax for that year by using the maximum standard deduction of $1,000. For the 3 years in question the petitioner produced checks proving charitable contributions to Congregation Beth El in the amounts of $25, $40, and $40, respectively. He testified that during all of the years before the Court, he had in effect a charitable program *141 under which no solicitation was refused. He stated that all of his payments were in cash, and either an even $5 or an even $10. The petitioner did not explain how his contributions for 1956 and 1957 totaled a number not divisible by 5. The petitioner attempted to prove his program of charitable contributions by submitting a list of the solicitations he received during the 3 years in issue. There were only 4 receipts for contributions totaling $55 in the entire exhibit. In some instances the above solicitations had attached forms which were to be returned with payment, but they had not been detached. Some of these solicitations bear a date of 1958, a period not before this Court. Considering all the facts of record, and the reliability of petitioner's testimony, it seems to us that the respondent was generous in allowing the petitioner $300 in each of the years 1956 and 1957. We uphold the respondent's determination, and provisionally allow $300 for 1955 for possible use in the Rule 50 computation. Opinion, Issue 7 The petitioner seeks deductions for legal fees of $1,000 paid in 1956 and of $1,150 paid in 1957. A part of these fees were paid in defense of assault and battery *142 proceedings against petitioner and the remainder was paid in connection with the divorce proceedings instituted by Janet. The respondent denied all of these deductions as being personal rather than business expenses of the petitioner. It is settled that the legal expenses of a divorce action are not deductible. United States v. Patrick, 372 U.S. 53 (1963). It follows that the $100 paid to Rosenthal in 1957 and the $500 paid to Morgan in 1956 and 1957, all in connection with the divorce action in the instant case are not deductible by the petitioner. In arguing for the deductibility of the expenses paid in connection with the defense of the assault and battery suits, the petitioner relies heavily on the fact that all of his bank accounts were frozen by attachments with a consequent threat to his income and principal. Rosenthal was successful in having the suits dismissed and the attachments lifted. The petitioner is in error in suggesting that the deductibility of legal expenses depends on the consequences of the suit to his income-producing property. In United States v. Gilmore, 372 U.S. 39 (1963), *143 after reviewing the relevant cases the court said at p. 48: The principle we derive from these cases is that the characterization, as "business" or "personal," of the litigation costs of resisting a claim depends on whether or not the claim arises in connection with the taxpayer's profit-seeking activities. It does not depend on the consequences that might result to a taxpayer's income-producing property from a failure to defeat the claim, for, as Lykes teaches, that "would carry us too far" and would not be compatible with the basic lines of expense deductibility drawn by Congress. * * * It is undisputed that the lawsuit in the instant case arose because of the personal relations of the petitioner and Janet Semel. The rationale of United States v. Gilmore, supra, compels a holding that the petitioner's legal expenses of defending the assault and battery suits are nondeductible as a personal expense. Opinion, Issue 8 In his return for the year 1956 the petitioner claimed a deduction of $1,210 for automobile expense. This deduction was computed on the basis of ten cents per mile on a total mileage of 12,100 miles. The only evidence offered in support of this deduction *144 was the petitioner's testimony. He testified that he owned two Cadillac automobiles, one for personal use and one for business use exclusively. In 1956 he used the business car for the purpose of checking on apartment buildings in New York, disposing of whiskey for the alleged joint venture, and picking up and delivering mail to the post office. The petitioner has never contended that these automobile expenses are deductible under section 162(a) as having been incurred in his business of being an employee of Semel, Inc., or United Distillers. His sole argument is that these expenses were incurred in connection with his personal real estate or whiskey business. We have already decided that the petitioner was not in the real estate or the whiskey business. These expenses may have been deductible by United Distillers or Semel, Inc., but they are not deductible by the petitioner. Deputy v. du Pont, supra; Burnet v. Clark, supra; Charles G. Berwind, supra; Heidt v. Commissioner, 274 F. 2d 25 (C.A. 7, 1959), affirming a Memorandum Opinion of this Court. Opinion, Issue 9 The petitioner seeks a $600 deduction for child care for *145 each of the years 1956 and 1957 under section 214. [8] The basis of the petitioner's claim is that he sent $40 per week to Janet Semel for support of his two children, pursuant to court order. The respondent denied the deduction on the grounds that the petitioner did not prove he incurred expenses for the care of his children necessary to enable him to be gainfully employed. His employment was with two whollyowned corporations during this period. The petitioner testified that the children resided with him only for 95 days a year, usually on week-ends. He did not prove any expenses incurred by him for this care at such times. He testified that he maintained a home in Connecticut for their benefit, but this expense was certainly not *146 necessary to enable him to be gainfully employed. It is also important that the petitioner did not attempt to show what part of the weekly payments of $40 was attributable to the children's well-being and protection rather than for food, clothing and education. We sustain the respondent's determination on this issue. Opinion, Issue 10 On his return for 1957 the petitioner claimed a deduction of $1,000 for office rent. The respondent disallowed the deduction because, "it has not been established" that the amount claimed was "expended for the purpose designated." The respondent admits the payment of the $1,000 but denies that it was for rent. United Distillers did not report rental income on its income tax return from this transaction. When questioned about this, the petitioner characterized this payment as an expense for office services. The office in question had numerous desks, adding machines, typewriters, multiliths, an addressograph and a file cabinet. In addition the petitioner used a secretary. The expenses of this office and the secretary were shared by the petitioner, United Distillers and Semel, Inc., in a proportion that cannot be determined from the record. *147 The petitioner testified that he used the office and the secretary mainly in connection with his real estate activities. We have found earlier that all of the petitioner's real estate business was carried on under the name of Semel, Inc. The expenses of conducting the business of his wholly-owned corporation are not the trade or business expenses of the petitioner. Deputy v. du Pont, supra; Burnet v. Clark, supra.Accordingly, the part of the office expense attributable to petitioner's work on behalf of Semel, Inc., is not deductible. The petitioner also testified that part of the office expenses were incurred in managing and supervising his investment portfolio. It is well established that these expenses are deductible. Norbert H. Wiesler, 6 T.C. 1148 (1946); William Heyman, 6 T.C. 799 (1946). Under the circumstances an allocation of the deductible part of the total office expense is necessary. Merton E. Farr, 11 T.C. 552 (1948). The petitioner's portfolio of stocks and bonds yielded an income to him of $31,278.02 during 1957. He testified that the office costs of managing his portfolio amounted to about *148 1 percent of his total investment income. This seems to be a very reasonable allowance. Applying the formula suggested by the petitioner, we conclude and hold that he is entitled to a deduction of $313 for 1957. Opinion, Issue 11 The petitioner claimed a deduction of $68 for lodge and association dues on his return for 1957. The petitioner argues that these dues payments are deductible because the personal associations made in the course of membership had potential business advantages and, accordingly, were proximately related to his business. The respondent disallowed the deduction on the grounds that it has not been proved that the membership dues were ordinary and necessary expenses of carrying on any trade or business of the petitioner. Although these expenditures might be related to the businesses carried on by United Distillers and Semel, Inc., this does not entitle the petitioner to a deduction. Deputy v. du Pont, supra; Burnet v. Clark, supra. These expenses certainly were not necessary to maintain his portfolio of common stocks. We sustain the respondent's determination on this issue. Decision will be entered under Rule 50. Footnotes
1. All Code references are to the Internal Revenue Code of 1954.↩
2. The balance sheet accompanying United Distillers' Federal income tax return for 1950 shows bonds, notes and mortgages payable with less than one year's maturity totaling $231,636.08 at the beginning of 1950 and $160,000 at the end of that year. Since United Distillers had an operating loss of $35,733.11 in 1950, it is certain that the reduction of short-term debt did not come out of current earnings.↩
3. Throughout this opinion we will use the term joint venture in the singular even though each set of 3 documents comprised a separate so-called joint venture.↩
4. The other "Joint Venture Agreement" refers to a "Note for $25,000."↩
5. The record does not indicate when the decision was made or why United Distillers was not granted the 7 new licenses, but this is not essential to the decision in this case.↩
6. The figure of $70,000 is admittedly an approximation, but it was used by both parties during the trial, and it is sufficiently accurate for our purposes.↩
7. The respondent would allow the petitioner itemized deductions for 1955 of $550 for alimony payments and $300 for charitable contributions. This would total $850 which is less than the $1,000 maximum standard deduction.↩
8. SEC. 214. EXPENSES FOR CARE OF CERTAIN DEPENDENTS. (a) General Rule. - There shall be allowed as a deduction expenses paid during the taxable year by a taxpayer who is a woman or a widower for the care of one or more dependents (as defined in subsection (c)(1)), but only if such care is for the purpose of enabling the taxpayer to be gainfully employed.↩